Good morning. May it please the court, my name is Kay Nordhunt and I represent the appellant Scott Johnson as guardian ad litem of HTP. The trial court abused its discretion in excluding appellant's expert witness testimony on specific causation, leading to the resulting grant of summary judgment to respondent Mead. As this court has recognized, a differential diagnosis which encompasses differential etiology satisfies the Daubert reliability standard, and differential etiology need not rule out all alternative causes, but it must at least consider other factors that could have been the sole cause of the plaintiff's injury. And as this court has stated, indeed differential diagnoses are presumptively admissible, and a district court may exercise its gatekeeping function to exclude only those diagnoses that are scientifically invalid. A failure to consider alternative causes can render a differential diagnosis scientifically invalid, but no such failure occurred here. Here appellant's experts provided reasons for rejecting alternative hypotheses. As this court has also stated, a certain amount of speculation by an expert is necessary, an even greater amount is permissible and goes to the weight of the testimony, but too much is fatal to admission. Such fatal speculation did not occur here. It stands undisputed that all three experts addressed Little Falls chlorinated municipal tap water as a likely source of HTP's CSAC infection, and concluded it was not. HTP's home was served by Little Falls municipal chlorinated water. As Dr. Farmer explained, there are no confirmed reports of pathogenic strain of CSAC having been isolated from chlorinated municipal tap water. Chlorinated municipal tap water has never been documented as being the source of any CSAC strain that caused a case of neonatal meningitis, and there was no evidence that CSAC has ever been isolated from the Little Falls Water Department Treatment Facility. Is that water tested for CSAC? The water is testified that it wouldn't be particularly good, but the treatment should also take care of any CSAC, so that's what the record is with regard to coliform testing. What's interesting is the MEADS experts point out the fact that there was coliform that proved positive for coliform in previous periods, but what's, when we went back and looked at the records for the time period in question, there was no, it was not positive for coliform, it was negative. And they also, the trial court also points about where the testing is. It's true that there was no testing done in HTP's home or the water pipes, but where the testing is done for the municipal water system, it is in an area right around where the apartment is located, so it is very close to a testing site. So it was based on all of this that the appellant's experts concluded that it was not likely that the water was the source of the CSAC infection. In this differential ideology process, you call it differential diagnosis, but it's really differential, you're looking for . . . . . . The cause. Rule in, and then rule out. Do you need to rule out everything in order to be able to opine that the most likely cause is the CSAC or something else? It seems to me the district judge had a standard that everything had to be ruled out before these experts could testify, and that's not my understanding of the application of the rule on admissibility under Daubert and Kumho-Tyre in the later cases. No, and I agree with you, Your Honor, and that is the trial court was applying the wrong standard. You do not have to rule out everything in order to apply differential etiology or differential diagnosis. Now, there's no dispute that there was a rule in. I mean, everybody concedes that CSAC was the cause of the child's problem, and so the issue was where did the CSAC come from, and that's . . . Right.       . . . . . . . . . . . . . . . . . . I'm not going to question your good adversary about that, maybe if I get a chance. Right, and that's why . . . I mean, that's true, and the problem is when I was looking at the case law, there is very few cases where you're precluding on ruling out, and virtually none where you actually have addressed the other causes. Generally where it's been a problem in the application of differential etiology is where the experts do not address the alternative causes, and then the court says, well, then it's not scientifically valid. Well, it's my understanding that Daubert was designed by Justice Blackmun to be an extension of admissibility in terms of expert testimony. Always before, it had to be the scientific community had to adopt it, but there was a lot of things happening that the scientific community didn't know anything about, but so as long as the expert that was testifying had the proper credentials, then you kind of let it in with some guidance, and the jury decided its credibility. Is that . . . have I missed the boat on that? No, that's correct, and actually in Rule 702 when it was promulgated was also a liberalization of the admissibility of expert testimony, so the presumption, as this Court has stated and as the U.S. Supreme Court has stated, is that it is admissible. But counsel, is it . . . while we're talking in broad strokes here, we're going to rule on one case, but while we're talking in broad strokes, you may know the academic literature on this shows overwhelmingly that trial judges are affirmed on Darbut rulings. It's 90-some percent, generally, in this circuit and everywhere. Tell me, what makes this case different? Why is it in the 10 percent? What makes this case different is exactly what I've just stated, that where the Court has affirmed, and we're talking . . . I think we have to talk in terms of differential diagnosis, differential etiology. It's different because generally, and I would say the clear, maybe the overwhelming majority of the cases, is where the Court rejects it at the ruling in stage, not at the ruling out stage. And when you look at the ruling out stage, like I said, where you see the affirmance of the trial court is where there has been no explanation. It hasn't looked at the alternative causes proposed. A non-speculative alternative cause. Right. And here, where you are addressing the alternative causes, then I find virtually no case law where that is coming up or where the Court is being affirmed, where you have the fact that you have experts presenting reasons why that it should be allowed in. Most of the rulings are, as I read the cases, are that these kinds of things are admissible and we affirm them. In fact, there is a case in this district, isn't there, that goes the other way. So it seems to me the high admissibility rate may run favorably to the affirmance by this Court of those things. That's true. But that's why I say that here where you have where it's excluded and it's excluded at the ruling out stage where it is explained by the experts why they would rule it out, there are very few cases that have come to the Court. And I suggest it's probably very few cases where the district court has done so because it really is contrary. Well, address water. I think the crux of the district court's, I'm quoting basically, that your experts had no reliable basis upon which to rule out water as a possible source. Pipe water is not tested. The city water testing was insufficient. You got my point. Add in the kitchen sink arguments, you know, about the testing of the cupboard and the kitchen sink and all that. Why is that not enough to affirm the district court? It is not enough because there was, what we're not looking at is the correctness or if more testing could have been done. We're looking at the methodology. And where you have experts who look at the epidemiological research, they look at the fact, for example, that there's no documentation anywhere of CSAC causing neonatal meningitis that comes from chlorinated tap water. You're looking at the municipal treatment records. The fact that it's true, the home wasn't tested, but other, all these other things are in play. And so now we're talking about going to the weight. We're going to the ability of the other side to cross examine that. Let me ask you a factual point that you reminded me of there. There was talk at the brief at points about well water. It wasn't developed by either side. Tell me, was there well water involved here or not? No, there was not well water. This was Little Falls Municipal Treated Waters. I swear that the brief somewhere had well water. What happened was, is the mother of HTP in one of the first documents stated that well water, but that's incorrect. And that it was in fact the apartment is serviced by Little Falls Municipally Treated Water. Is it in the record whether it's a city that can have well water? Many cities can't have well water, basically. It's not in the record, so it really wasn't developed. The other point of the trial court's ruling was with regard to the home environment. And again, it's true that when the infection was developed, there were no swabs. But the concern here is kitchen hygiene. And if you look at even what Mead presents, they presented a study about kitchen hygiene being important and it should be thoroughly cleaned before use. And concluding that the home environment was not a likely source, all of appellant's experts looked at the fact that HTP's mother was a self-described germaphobe. Cleanliness was very important to her. Everything was cleaned. The appellant's experts recognized that there's slight risk of infection from other sources, so that the cleaning of the kitchen was very important. Was there any evidence of any kind of a more likely source than the formula for the infection? In other words, was there any evidence that there had been sea-sack infections that emanated from the city water, the city water at work here, or had been found to be emanating from poor hygiene in the kitchen? In other words, you don't have to, as I understand the rule, you don't have to but you're looking for the more likely source. So was there evidence from the other side that there was a more likely source? No. You had the clumping of the bacteria and the fact is there had been two recalls by this firm, had there not? Correct. So no, there had not. The last point I'd like to make is a quick reference to the Minnesota Supreme Court's decision in Schaefer. The district court, after precluding the expert testimony, talked about the Schaefer case and articulates using its three-pronged circumstantial evidence test, but that's not applicable in this case. In Schaefer, what happened was there was a, someone took a chicken muffin and it cut the person's throat. They were not able to identify what was in the muffin that caused the problems with the throat. The Minnesota Supreme Court said in that factual situation, we're going to have this three-factor test to establish a prima facie case in which the specific harm-causing object or substance cannot be identified. Well, that's not the specific harm-causing substance is, it's C-sac. The question here is whether the C-sac in powdered infant formula was the cause of HTP's meningitis. So the test that was articulated in Schaefer has absolutely no application to the facts of this case based on the Minnesota Supreme Court's own enunciation of when it applies. So I ask that this court reverse and remand for a trial on the merits. Thank you. Thank you, counsel. Mr. Anscombe. May it please the court. Good morning, your honors. Anthony Anscombe on behalf of Mead Johnson. This case isn't about choosing which expert was right. It's not about ruling out every element. This is not a dispute about the foundational elements for the plaintiff's expert's claims. What this appeal is about is whether the trial court was within its discretion in concluding that the plaintiff's three causation experts did not use a reliable methodology and did not apply that methodology reliably to the facts of this case. Yes, your honor. So what this court has noted is that a differential etiology can be a reliable methodology in circumstances, and that's what this court held in the Turner versus Iowa Fire Equipment case, but it can be unreliably applied. And in Bland versus Verizon, the court recognized that in circumstances where causes, where the universe of causes of a particular illness aren't characterized, that a differential etiology may in fact not be a scientific or adequate scientific methodology. And this is what the Federal Judicial Center has said about differential etiologies, is that it may not be an appropriate methodology where the universe of what can be ruled in and what can be ruled out, where that universe isn't known. You have to know a substantial number of the causes of a particular illness in order to be able to know. What was the evidence in this case as to, quote, the universe of causes for CSA? That, your honor, is where the lack of any coherent epidemiologic evidence really comes into play. The only thing that's been identified as a risk factor for chronobacter has been infant formula, but what the World Health Organization has said is that the contribution of other causes is unknown. It hasn't been studied in a systematic way. Yes, your honor. I'm hearing you say that differential etiology, according to the federal, what did you say the reference manual on scientific evidence on scientific evidence, uh, isn't a, uh, a logical tool to, uh, deal with these to keep these, uh, experts from testifying. The reason why this court, if it's on, if it's an unsavory approach, then he was wrong there, right? Uh, well, uh, no, respectfully, no, no, your honor, because it's the methodology that the plaintiffs used me. Johnson didn't choose that methodology. The court didn't choose that methodology. This is what the plaintiffs experts came in. This was their justification for reaching the conclusions that they reached was to, to try to do this process of ruling in and ruling out. And the reason that that is a scientifically unsound approach here is because, uh, because chronobacter with a couple of instances that I'll tell you about here has never been studied systematically. The scientific evidence that the epidemiologic literature on which these experts rely was comprised entirely of case studies and case reports, which, which had never been systematically studied. And so there was not a meeting of the minds in the intellectual community, the scientific community that deals with these things. That's the exact reason that Justice Blackmun thought that there needed to be an expansion of the admissibility of expert testimony under the Daubert and Kumho Tile, Tile, Tire, uh, arrangement. And so that a, a single scientist who had the scientific background, knowledge, education, and so forth could come up with a rationale as to why he or she or somebody could testify on a scientific study. Your Honor, uh, Daubert's holding has been codified into a federal rule of evidence 702 and it requires, and it requires, it requires a reliable methodology and it requires that methodology to be reliably applied. The problems that the plaintiffs have in this case is that, uh, that, that their, their reading of the, their, their, their opinions are predicated on unsound scientific principles. The core of their opinions, uh, Your Honor, in terms of how they ruled in Cronobacter and how they ruled out these other, uh, sources, uh, is that, uh, they looked at case studies and case reports, which stipulated that the rule in was okay. Uh, it was, we agreed, Your Honor, um, that as a general matter, historically in outbreak situations, uh, there have been instances where, where infants developed a Cronobacter infection, uh, and Cronobacter was also found in unopened cans of infant formula. And the bacteria clumps. And so you even could have a test, a, um, a pound or a quarter, however it's sold and find no C-sac, but the C-sac could have been there and just been used or not picked up in the sample and so forth. So you're, so you've got it ruled in. The issue here is ruling it out, isn't it? Uh, well, one of the issues is ruling it out. Uh, that, that's true as, as a general matter, it can be ruled in. Uh, we have the issue about whether the plaintiff's experts ever properly contemplated the application of heat. That was, that was something that this mom, I craved every single one of these, uh, and the plaintiff's experts never considered that. So I think the district court did not actually address the, the application of heat issue. Uh, and, uh, uh, for that reason, we think in terms of specific causation, it was never ruled in, but from the abstract standpoint of general causation, we agree that historically there have been instances where, where formula was shown to be the source. But do you believe that they have to rule out quote all other possible causes of the victims conditions? Absolutely not. They don't have to rule out every, that's the Turner case. You know, the Turner case says all other possible causes. Well, they have to rule out all ones that might be, uh, that might be plausible. One of the problems, slowly with me, do you know the Turner cases uses the language, all other possible causes. Now it does say to right before that, to a reasonable degree of medical certainty. But so you say that's that we're wrong in your honor. My problem with, with this case is even more basic than that. They didn't rule out anything. All right. And they didn't rule out anything through any application of scientific principles. Time and again, what they rely on to say that, you know, their central tenant, your honor, is that, uh, that infant formula is the leading cause of, uh, infection in infants, but that's based on case reports. And the problem with case reports is that they are not conducted in a way that evaluates all potential causes. The reports, as this court has noted in Glass-Dutter and in Turner, case studies and case reports do not permit general, uh, uh, uh, uh, calculations of risk. There are no odds ratios, no relative risk. There's no competent epidemiologic evidence in this case to say that infant formula is a more common source than anything else. All they had was a bunch of tires that blew out. There was no scientific evaluation of the, of the, uh, tire to see precisely why it blew out. It just blew out. And, uh, isn't that kind of run upstream? Um, your honor, what I, what I, these were unscientific reports, right? Well, the conclusions that these plaintiffs are drawing, these experts have drawn from case reports are profoundly unscientific. This is textbook epidemiology, your honor. You cannot draw risk. You cannot calculate risk based on case reports. There have been, and I mentioned a moment ago, there have been a couple of occasions where, where chronobacter, the incidence of chronobacter has been studied systematically. We referenced the Stoll study in 2004, where, uh, where, where professor Stoll evaluated 10th, the records of 10,000 very low birth weight infants to determine whether to determine the incidence of chronobacter in that population. It's an incredible, that is the most sensitive population for chronobacter infections. I want to try out a different legal standard. There was only there. Oh, I'm sorry. There was only, there was only one, there was only one report of illness and that was in a baby who had not been exposed to powdered infant formula. I want to try it in a different legal standard. You can also get from our cases that in the ruling out, you have to rule out all non-speculative causes. You agree with that standard? I think I said, well, your, your honor, the, the, the problem that we have here is that because this universe of other causes other than formula has not been defined, it's very difficult to say that something speculative or not speculative. We have some ideas about what some leading ways where bacteria of this type could be communicated, such as through the water in every single instance where a baby has become ill from, uh, uh, after consuming powdered infant formula in a hundred percent of those cases, that formula was mixed with the Supreme court's words in several cases, wise Graham from the circuit and a couple of others, expert testimony that is speculative can't get in, but they imply if it's non-speculative, it's okay. Right. But you're disagreeing with that standard. I would never disagree with the Supreme. Logically there are three or four standards in our cases. I hope you're in other cases as extreme causes, uh, don't have to be ruled out whatever extreme causes are right now. I'm trying to get, I'm trying, what I'd like you to help me on and I'm sincere is what's the legal standard. Uh, I think that, um, uh, your honors, I think, I believe that that plausible causes are the ones that need to be ruled out. Yeah. We're not, we're not contending in this case, for example, that these decisions are, are inadmissible because a fruit fly flew in, you know, through the open window and went into the baby's mouth. We're not, we're not suggesting that. What we are suggesting though, is that, that based on our understanding of how illnesses are communicated, uh, through, um, through, through water, uh, through human contact, through the environment, uh, that those things could never be properly ruled out in this case. And what the district court was really getting at here is that the, that the plaintiff's experts applied one set of standards when it came to ruling in me, Johnson's product and a different set of standards when it came to ruling out these alternative causes, the water, for example, would be a prime instance of that. You guys could help you in your answer to judge Benton's question. Uh, expert testimony should be admitted, admitted if it quote, advances the trier of facts, understanding to any degree. That's Robinson versus Geico. That's a case that we decided in 2006 and we resolve about the usefulness of expert testimony in favor of admissibility, United States versus Finch. So, so if, if in this ruling out thing, if, if it seems that the district court has discretion, but it is tempered by the idea that if this is going to be helpful and it seems to me that that's the test here and with the work, the, the case reports and all the things that they took, the experts talked about, you then are perfectly free to bring your experts on and say, this is a bunch of baloney. Here's really what they should have done. And then the jury decides who's credible and who isn't. That's, that's our adversary system, isn't it? Well, your honor, there can only be a battle of the experts if the experts have used reliable methodology and applied it reliably. And here that absolutely has not occurred. There has been a profound misreading of case reports to rule out alternative sources of illness. The, the, the, when ruling out the water, the plaintiffs ignored, experts ignored the very same precepts that they use to be able to rule in the powder, notwithstanding the fact that the powder had been tested voluminously by the FDA, the CDC and by me, Johnson. The, the plaintiffs have applied a dual set of standards when it has come to evaluating the environment. They suggest that me Johnson's environment was, uh, was, uh, was unclean because, uh, uh, because biofilms can fall form and resist cleaning. Those exact same principles apply in the plaintiff's home. And therefore, yeah, Newton's laws of evidence don't just apply. Sometimes our laws of physics don't just apply. Sometimes they apply. And, and, and so that, that fundamentally is the problem here. Thank you very much, your honors. Thank you, counsel. Ms. Hunt, I believe you used all the, uh, the appellate have any time left for rebuttal? Okay. Um, it's an important case as they all, and we did, uh, push you quite a bit with questions the first time. If you've got, uh, something burning in direct response to, uh, something that the, uh, appellee brought up, we'll give you one minute. The argument that was made this morning by respondent in large part was actually rejected by the trial court with regard to the ruling in phase and the use of differential etiology. So, I mean, but the, the trial court did not, uh, assert in its ruling that differential etiology was not a reliable methodology, nor did it assert that it was not a reliable methodology here, other than with the courts, how it analyzes the ruling out stage, which it was done contrary to the record and contrary to the law has been as enunciated. Um, the other case, I mean, there's been a lot of cases kicked around this morning from this circuit, but then we have the Lawson case, which is one of the first cases discussing, um, differential diagnosis and Daubert and where judge Lay said that an expert's causation opinion should not be excluded because he or she has failed to rule out every possible alternative cause. So that was kind of the starting point in this circuit and then it's gone from there. So I ask that this court on this record and based on the law reverse and remand. Thank you. Court wishes to thank both counsel for your presence in argument this morning. Consider your case submitted. We'll render decision in due course. Thank you.